**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In Re: ) | | |
| ) | | |
| CYNTHIA L. McCLELLAND, ) | | |
| ) | | |
| Debtor. ) | Case No. 06-41720 | |
| ) | | |
| CYNTHIA L. McCLELLAND, ) | | |
| ) | | |
| Plaintiff, ) | Adversary No. 07-4065 | |
| ) | | |
| vs. ) | | |
| ) | | |
| FAMILY DWELLINGS, LLC; ) | | |
| FORTRESS FINANCIAL, LLC; ) | | |
| DONNA M. FOWLER, d/b/a ) | NOT FOR PUBLICATION | |
| D.M.F. & Associates; and ) | | |
| JOHN M. HOWARD, d/b/a ) | | |
| Howard Appraisal Group, ) | | |
| Defendants. ) | | |

**MEMORANDUM OPINION**

      The Debtor and Plaintiff, Cynthia McClelland, initiated this adversary proceeding to avoid a lien held by Family Dwellings, LLC on her home and to assert affirmative claims for relief against Fortress Financial, LLC ("Fortress"), Family Dwellings, Donna M. Fowler d/b/a D.M.F. & Associates, and John M. Howard for various tortious acts related to the purchase and financing of her home. Prior to trial McClelland's claims against all defendants but Fortress were settled. The Court held a trial on this matter on June 3, 2008, at which time the Debtor offered evidentiary and testimonial evidence. Fortress filed an answer to the Debtor's complaint and received adequate notice of the hearing, but it did not appear at the trial.

      Upon consideration of the pleadings, the evidence, and relevant law, the Court will enter judgment for Plaintiff and against Fortress on the Plaintiff's claims for fraud, breach of fiduciary duty, and violations of the Missouri Merchandising Practices Act ("MPA")[1] – Counts I, III, and V of the Amended Complaint.

---

[1] Mo. Rev. Stat. § 407.020, *et seq*.

## BACKGROUND

In September 2004, Cynthia McClelland lived with her son in a rental house which had many serious defects, including a leaking roof and a furnace and water heater that were nonfunctional. Having endured these conditions for eight years, McClelland decided to try and purchase a home of her own. McClelland had never purchased a home and did not understand the process, so she called a real estate agent, Zada Smith of D.M.F. & Associates, whose advertisements she had seen.[2] McClelland explained her situation to Smith, telling her that McClelland had worked for the same employer for twelve years, earning approximately $2,000 a month before taxes, and that she could afford a mortgage payment of no more than $500 per month. McClelland asked Smith if, given her income, she could afford to purchase a home. Smith assured her that she could and agreed to be her buyer's agent. Smith showed McClelland several homes that she said McClelland could afford, including one at 6718 Paseo Boulevard, Kansas City, Missouri. Smith told McClelland that the home had been fully renovated, that the roof was new and would not leak, that the furnace and water heater were brand new and would work once gas service was restored, and that a list of eighteen items would be repaired prior to McClelland's purchasing the home. In truth, the house had not been professionally renovated, the roof was at the end of its useful life with several active leaks, the furnace was inoperable, the water heater was not properly installed causing carbon monoxide to leak into the house if used, and the gas meter had been removed so that gas service could not be restored without costly replacement of the meter and pipes. When McClelland mentioned hiring an inspector to inspect the property prior to her purchasing it, Smith told McClelland that she did not need an inspector and probably could not afford one.

The house was owned by Family Dwellings, LLC, and had been on the market for approximately eight months, during which time its listing price had been lowered to $72,000 – the price listed on the date Smith showed the house to McClelland. McClelland agreed to purchase the house, believing that she was agreeing to a purchase price of $68,000. The price stated in the contract McClelland was ultimately given to sign, however, was $86,000 – $14,000 higher than the listing price and $18,000 higher than McClelland believed she was paying.

---

[2] Ms. Smith is now deceased.

Smith contacted Philip Balthazor, a loan officer at Fortress, and asked him to arrange a loan for McClelland. Smith then drove McClelland to Fortress, where she met with an employee of Fortress and signed a "Good Faith Estimate" of closing costs and other paperwork. The documents were not explained to McClelland, she did not understand them, and she was pressured to sign them without reading them.

Balthazor and Fortress arranged a much more expensive loan for McClelland than she was qualified for. Alfred Pitzner, who has worked for 13 years as a loan officer at James B. Nutter and Company, a mortgage lender in Kansas City, testified that, based on McClelland's income, employment history, and credit report, in October 2004 she would have qualified for a conventional, fixed-rate loan with an interest rate of no higher than 7% and no closing costs. Fortress, however, arranged for an adjustable interest rate loan, with an interest rate that had increased to 10% by June 1, 2008, and charged her $3,702 in closing costs. The closing costs included a $688 loan origination fee, a $1,638 broker fee, and $1,376 as a "yield spread premium." The Good Faith Estimate provided to McClelland earlier had stated that her closing costs would be $1,747.50. Mr. Pitzner opined that the only reason Fortress and Balthazor would have arranged for this loan for McClelland was that it was more profitable for Fortress to put McClelland in a higher-interest, adjustable rate loan.

Fortress knew from McClelland's work history and income information that McClelland could not qualify for or afford the payments on the loan it arranged for her, so it falsified her income on the loan application at closing. Fortress accomplished this, in part, by arranging for a "stated income" loan, meaning that the income stated on the loan application would not be verified. The use of a stated income loan resulted in the assessment of higher fees for Fortress and a higher interest rate. Moreover, a stated income loan wasn't appropriate for McClelland because she had provided verification of her income to Fortress in the form of a W-2 statement. According to Pitzner, stated income loans are typically used when the borrower is self-employed, for instance, and income is difficult to document or verify.

Fortress also failed to disclose to McClelland other critical terms of the loan, including the amount of the monthly payments, the adjustable rate feature, and the existence of a prepayment penalty. McClelland credibly testified that she would not have entered into the loan had she known these terms.

Prior to closing, the lender, Olympus Mortgage Company, required an appraisal of the house. Although standard industry practice is to have local appraisers conduct loan related appraisals, Balthazor arranged for an appraisal by John Howard, a licensed appraiser from Clarksdale, Missouri, a town more than 70 miles from Kansas City. Apparently, Fortress had an ongoing relationship with Howard, who has conducted as many as 50 appraisals for Fortress, including 15 to 20 for loans specifically handled by Balthazor.

Before Howard prepared the appraisal, Fortress informed Howard that the contract price on the house was $86,000. Not surprisingly, Howard returned an appraisal on September 23, 2004, with a value of $86,000. Linda Weisenborn, a residential appraiser in Missouri since 1982, reviewed Howard's appraisal and testified that the value of McClelland's house in September 2004 was no more than $67,000. Both Weisenborn and Pitzner testified regarding the numerous inaccuracies in Howard's report, and what they called "red flags" that the appraisal was fraudulent, including the use of an unusually large number of comparable sales (five), large adjustments made to the values of those comparables, and several material factual misstatements, including the assertion that the home's MLS listed price was $86,000, when in fact it was $72,000, and a description of the house as "totally renovated", "well maintained", and "in good condition," when, in fact, the home was in considerable disrepair. Howard's report relied on data from comparable sales an average of one mile away from the subject property and failed to include as a comparable sale a house that was next door to McClelland's and which sold for only $55,000.

On October 15, 2004, Smith drove McClelland to Continental Title Company in Overland Park, Kansas, for the loan closing. Smith handed McClelland a stack of over 70 sheets of paper, flipped through them quickly, and instructed McClelland where to sign. When McClelland asked for an explanation of the documents, Smith told her they were documents necessary to "get her in the house," and that she "wouldn't understand them in a million years" even if she read them. Smith informed McClelland that the monthly payments would be $502. Trusting Smith and believing that she was purchasing the home for $68,000, McClelland signed the documents. Unbeknownst to McClelland, among the documents she signed were a first and second mortgage, totaling $86,000. The first mortgage was an adjustable rate loan from Olympus. The second loan was for $17,200, with a balloon payment after two years. Both loans were secured by a deed of trust on McClelland's

house. Also among the papers given to McClelland to sign were two different loan applications, one correctly stating her monthly income as $2,028, and the other misstating it as $3,250. McClelland signed all the documents she was directed to sign, but was not provided with copies at that time.

When McClelland went to her new house a few days after the closing, she discovered that almost none of the promised repairs had been made. There was no heat or hot water, the roof leaked, and the furnace and hot water heater were inoperable. With her modest income, McClelland could not afford both the mortgage and the necessary repairs, and as the interest rate adjusted higher, she could not afford even her mortgage payment. She became very distressed, suffered from insomnia and other stress-related health difficulties, and finally decided to file a Chapter 13 bankruptcy in an attempt to save her home from foreclosure.

## DISCUSSION

McClelland's Amended Complaint alleges four causes of action against Fortress: (1) breach of fiduciary duty; (2) fraud; (3) violations of the MPA; and (4) negligent misrepresentations. The Court addresses each of McClelland's claims *seriatim*.

### I.   Breach of Fiduciary Duty

McClelland contends that Fortress breached its fiduciary duty to her as her mortgage broker. McClelland prevails on this cause of action because Missouri law recognizes the existence of a fiduciary relationship between a mortgage broker and a homebuyer, and the uncontroverted facts establish that Fortress breached that duty to McClelland.

Under facts similar to this case, the Missouri Court of Appeals affirmed a trial court's judgment that a mortgage broker had a fiduciary duty to a homebuyer and that the broker breached that duty by: obtaining an appraisal that was unreasonably inflated, obtaining a loan it knew its client could not pay, failing to keep its client fully informed, misrepresenting material facts, and failing to act in good faith and with reasonable skill, care, and diligence in its client's behalf.[3]

---

[3] *Jefferson v. American Financial Group, Inc.*, 163 S.W.3d 485, 488 (Mo. Ct. App. 2005). *See also*, *Armstrong v. Republic Realty Mortgage Corp.*, 631 F.2d 1344, 1349 (8th Cir.1980) (recognizing a mortgage broker's fiduciary duty to a homebuyer).

By agreeing to act as McClelland's agent to find an appropriate loan for her, Fortress owed her a fiduciary duty. In his deposition, Balthazor admitted as much, describing his relationship to McClelland: "It means it's fiduciary, it's my job to go out and make sure clients understand and make sure the clients get the best deal that's there for them."

Fortress breached its fiduciary duty to McClelland by, among other things: 1) conspiring and participating with Smith and Howard in a plan to inflate the appraisal of the home; 2) concealing the home's lower value and listing price; 3) falsifying McClelland's income on the loan application at closing; 4) failing to make a *bona fide* effort to obtain a suitable loan for McClelland and procuring a high-cost unaffordable loan instead; and 5) failing to disclose the terms of the first and second mortgage loans. McClelland suffered damages as a result of Fortress's breach of its fiduciary duty to her.

**II. Fraud**

In Missouri, common law fraud has nine essential elements: "a representation; that is false; that is material; the speaker's knowledge of its falsity or ignorance of its truth; the speaker's intent it be acted on; the hearer's ignorance of the falsity of the representation; the hearer's reliance; the hearer's right to rely on it; and injury."[4] A person (or entity) who conspires with others to commit fraud is liable for the fraud committed even if he or she (or it) does not actually make a fraudulent misrepresentation.[5] And the standing to sue for fraud extends beyond the person to whom the fraudulent representation was made; a third party who is injured by a fraudulent representation may also maintain an action for fraud.[6] The Court finds that Fortress committed at least two fraudulent acts – one directly and one by participation in the conspiratorial commission of fraud.

---

[4] *State ex rel. PaineWebber v. Voorhees*, 891 S.W.2d 126, 128 (Mo. banc 1995).

[5] 15A C.J.S. *Conspiracy* § 46 (2008).

[6] *See Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. ____ (2008) (slip op., at 16) ("[T]here is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it. . . . [The Restatement (Second) of Torts] provides only that the plaintiff's loss must be a foreseeable result of someone's reliance on the misrepresentation."). *See also Freeman v. Myers*, 774 S.W.2d 892 (Mo. Ct. App. 1989), (holding that an injured third party can sue based on fraudulent misrepresentations made to another person.).

6

First, Fortress committed fraud by falsifying McClelland's loan application in order to ensure the loan would be funded. At the loan closing, McClelland was instructed to sign two different loan applications, one correctly stating her income was $2,028 per month, and one falsely stating it was $3,250 per month. Fortress's representation that McClelland's income was $3,250 was both false and material, and Fortress both knew it was false and expected it to be relied on. The fact that it expected Olympus, not McClelland, to rely on its misrepresentation does not absolve Fortress of liability to McClelland for fraudulent misrepresentation. Without Fortress's fraudulent misrepresentation of McClelland's income, the loan would never have gone through, and McClelland would not have suffered damages.

Second, Fortress is liable for the fraud committed by the appraiser, Howard, when he produced an inflated valuation of McClelland's house for the specific purpose of qualifying McClelland for a loan she could not afford but that would be profitable for Fortress. Fortress hired Howard to appraise the house for an amount no less than $86,000, and that Fortress knew that Howard's appraisal was inflated. Howard and Fortress also both knew that Olympus would rely on the appraisal to fund the loan to McClelland. McClelland suffered damages as a result of the fraud perpetrated on her by Fortress in conspiracy with Howard.

### III.   Violation of the Missouri Merchandising Practices Act

Section 407.020 of the Missouri Revised Statutes, commonly known as the "Missouri Merchandising Practices Act," provides that, "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise[7] in trade or commerce . . . is declared to be an unlawful practice." The scope of the

---

[7] "Merchandise" covers "services," including the extension of credit. Mo. Rev. Stat. § 407.010(4); *Fielder v. Credit Acceptance Corp*. 19 F. Supp.2d 966 (W.D. Mo. 1998), vacated in part on other grounds, 188 F.3d 1031 (8th Cir. 1999).

7

MPA is broad.[8]  Section 407.025 provides a civil cause of action to consumers who purchase goods or services and suffer damages due to any of the aforesaid unlawful practices.[9]

Fortress committed numerous acts outlawed by the MPA, including falsifying McClelland's loan application; conspiring to sell McClelland a home for far more than it was worth; baiting McClelland with a fixed-rate loan with $1,747.50 in closing costs disclosed in a Good Faith Estimate, then switching her to an unaffordable adjustable rate loan with $3,702 in closing costs; concealing from McClelland the true terms of the first and second mortgage loans; arranging for a higher interest loan than McClelland qualified for in order to secure a yield spread premium, without disclosing or explaining this premium to McClelland; and failing to provide timely or adequate disclosures to McClelland.

McClelland suffered damages as a result of Fotress's violations of the Missouri Merchandising Practices Act.

## IV.    Negligent Misrepresentations

McClelland's Amended Complaint also includes a number of claims in Count II of negligent misrepresentation by Fortress.  However, having already decided that Fortress's acts were willful and intentional, the Court need not reach the question of Fortress's negligence.

## V.    Punitive damages

The Court finds Fortress's conduct under Counts I, III, and V was outrageous by reason of its reckless indifference to McClelland's rights and the rights of others, and thus punitive damages are awarded to punish Fortress and to deter Fortress and others from like conduct.

---

[8] *Ports Petroleum Company, Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001) (The statute "cover[s] every practice imaginable and every unfairness to whatever degree.").

[9] Mo. Rev. Stat. § 407.025.

## CONCLUSION

This Court finds in favor of Plaintiff-Debtor McClelland on her claims of breach of fiduciary duty, fraud, and violations of the MPA and accordingly enters judgment against Fortress on Counts I, III, and V.[10]  The Court awards McClelland a total of $56,262 in actual damages, comprised of $3,702, representing the fees received by Fortress, and $52,560, representing the difference between the payments McClelland will make over the life of her 30-year loan at 10% interest versus the payments she would have made on the 7% fixed interest rate mortgage for which she qualified.  The Court also adjudges punitive damages against Fortress in the amount of $100,000.  Actual and punitive damages are awarded under each Count, so that there is a single award of actual damages of $56,262, and of punitive damages of $100,000, and any payment toward satisfaction of the actual or punitive damages awarded under Counts I, III, or V will count toward satisfaction of the damages awarded under all three Counts.  It is further ordered that Count II was abandoned by the Plaintiff at trial and thus is dismissed with prejudice.

Costs of this action are assessed against Fortress.

A separate order consistent with this Memorandum Opinion will be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 20th day of June 2008.

      /s/   Jerry W. Venters
United States Bankruptcy Judge

A copy of the foregoing mailed electronically or
conventionally to:
Susan Kephart
Fortress Financial, LLC

---

[10] Count IV of the Amended Complaint alleged a breach of fiduciary duty by Donna M. Fowler, d/b/a D.M.F. & Associates and Count VI sought to avoid the second mortgage lien held by Family Dwellings, LLC. These two counts were resolved by settlement.